UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LARUE PERKINS,

    Plaintiff,

vs.

ROBERT TOLEN, individually;
JOHN RUTHERFORD, in his official
capacity as Sheriff of the Consolidated
City of Jacksonville,
Florida, et al.,

    Defendants.
_____/

Case No.: 3:10-cv-851-J-37TEM

**DISPOSITIVE MOTION**

## DEFENDANT SHERIFF JOHN RUTHERFORD'S MOTION FOR FINAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendant, SHERIFF JOHN RUTHERFORD, in his official capacity,[1] pursuant to Rule 56, Fed. R. Civ. P., hereby requests that the Court grant summary judgment in his favor on Plaintiff's First Amended Complaint. In support of this motion, Defendant states that there is no genuine issue of material fact or law entitling the Plaintiff to recover on his claims against this Defendant under 42 U.S.C. §1983 (Count III) or Florida law (Counts V and VI).

### Factual Background

This action arises out of an encounter between Plaintiff Larue Perkins and Defendant Officer Robert Tolen of the Jacksonville Sheriff's Office. Mr. Perkins was arrested for, among other things,

---

[1] A suit against a public official in his official capacity is treated as a suit against the local government entity he represents. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989). Accordingly, Defendant Rutherford is referred to herein interchangeably as the "City" (City of Jacksonville/Duval County) or "JSO" (Jacksonville Sheriff's Office) or "Sheriff" as the context requires.

Resisting or Opposing an Officer in the Lawful Performance of his Duty in the early morning hours of January 20, 2008.[2]

Plaintiff alleges the following facts in his First Amended Complaint (Doc. 26):

1. He went bowling with friends at Jax Lanes in Jacksonville, Florida, on the night of January 19, 2008. (Doc. 26, ¶8)

2. After bowling for a while, Plaintiff and his friends stepped outside to smoke; subsequently, they were told by an employee of the bowling alley that they had to go back inside because they could not wear their bowling shoes outside the building. (*Id.* at ¶9-10)

3. When they went back inside, they were told by Defendant Tolen that he could have them arrested for going outside with their bowling shoes on. (*Id.* at ¶11)

4. Tolen, a police officer employed by JSO, was working at the bowling alley as a security guard for Jax Lanes on the night of the incident. (*Id.* at ¶6, 12)

5. After Plaintiff and his friends finished bowling, they called a cab, changed their shoes and went outside to wait for the cab. (*Id.* at ¶15)

6. While they were waiting, a fight broke out inside the bowling alley arising from the theft of a woman's purse. (*Id.* at ¶16)

7. An employee of the bowling alley ran out and said that "someone wearing a red shirt" had stolen a purse. (*Id.* at ¶17)

8. When the police arrived, the Plaintiff pointed out a person in a red shirt who had just gotten into a particular car. (*Id.* at ¶18)

9. Plaintiff then went back into the bowling alley to assist one of his friends who was sick in the bathroom; when the Plaintiff and his friends again left the bowling alley, a police officer told them to get in the cab and leave; as the Plaintiff was attempting to get into the cab, he was grabbed by Defendant Tolen. (*Id.* at ¶19-21)

---

[2] *See* Arrest and Booking Report, Incident #2008-58490 (filed hereafter). This Arrest and Booking report, as is standard practice with the JSO, is a sworn affidavit.

    10.    Tolen grabbed the Plaintiff in a "bear hug" maneuver and slammed him to the concrete face first; Tolen then straddled the Plaintiff, pulled his hands behind his back and handcuffed him. (*Id.* at ¶22-23)

Plaintiff testified to and affirmed the above facts at his deposition in this matter on February 25, 2011.[3] At his deposition, the Plaintiff also testified to the following additional material events of the evening and incident:

    a.    In Plaintiff's first interaction with Officer Tolen (immediately after coming back inside after being told to by the bowling alley employee), Tolen was irate and used repeated profanity when "telling" Plaintiff and his party that they were not allowed to go outside with their bowling shoes on and that he could take their "asses to jail" for having done so. (Dep. of L. Perkins at 87)

    b.    Plaintiff and two of his friends (Steve and Rob) shared two pitchers of beer over the course of bowling two games. (*Id.* at 89-91) Plaintiff himself had "about four" cups of beer. (*Id.* at 91)

    c.    After they finished bowling, Plaintiff and his wife and Joe Tucker walked outside to wait for their taxi. (*Id.*) As they were waiting, a "young, black gentleman" ran by him and jumped in a car and ducked down. (*Id.* at 92) A bowling alley employee then ran out and said that someone had stolen a purse and asked if anyone had seen where he had run to. (*Id.*)

    d.    Plaintiff pointed to the car the gentleman had gotten into and said "He's in that vehicle right there." (*Id.* at 93, lines 2-3) A couple of police officers then went to the car, pulled the fellow out and arrested him. (*Id.*, lines 18-20)

    e.    Plaintiff, his wife and Tucker then went back into the bowling alley to check on the others (Rob and Steve who were paying the bill, and the other women who had stopped in the bathroom on the way out) "because it was starting to get a little crazy" outside. (*Id.* at 96) They all (Plaintiff, his wife, Tucker, Tucker's wife, Rob, Steve and Steve's girlfriend) met up in front of the bowling shoe counter. (*Id.*)

---

[3] Plaintiff's deposition transcript will be filed hereafter with other documents and materials in support of this motion.

3

  f.  A fight then broke out to their right (to the west of them). (*Id.* at 97) Plaintiff heard someone in the fight yell out, "I'm going to kick these crackers' ass in here tonight. I'm going to kick me some crackers' ass." (*Id.*) Plaintiff thought they should all get away from the area and they all started walking toward the front door. (*Id.*) As they did so, Tucker called out, "You're not going to kick this cracker's ass tonight." (*Id.*, line 21)[4]

  g.  As Tucker called out what he said, Plaintiff and his party opened the front door and a "huge [white] cop" grabbed Tucker's arm and asked him, "Do you have a problem?" (*Id.* at 97-98) Tucker grabbed his arm back and said, "No. We're leaving." and the officer said, "Good. You all get up out of here." By then, the taxi had arrived. (*Id.* at 98)

  h.  As Plaintiff and his party were walking to the taxi, Defendant Tolen came up from behind them and said, "That's them young punks I had a problem with earlier." (*Id.* at 103) Plaintiff turned around and asked Tolen if he was referring to the "shoe incident" and said they were sorry for that and turned to continue walking toward the cab behind the rest of his party. (*Id.* at 104) Tolen then said, "You need to take your ass home now." (*Id.*, line 16) Plaintiff turned around a second time and said they were going home and had nothing to do with "what's going on in this building." (*Id.*, lines 17-19) Perkins said these things to Tolen in a calm manner and did not raise his voice at Tolen. (*Id.* at 104, lines 20-25; 105, line 1) Tolen then said, "That's it." and bear-hugged the Plaintiff from behind <u>as he was getting into the taxi</u> "and slammed [him] face-first on the concrete." (*Id.* at 105-106)

### The Plaintiff's Claims

Plaintiff makes several claims against the City, Officer Tolen and Jax Lanes, Inc. Counts I and II assert constitutional (Fourth Amendment) claims against Officer Tolen for False Arrest and Excessive Force. Count III is a municipal liability (*Monell*) claim against Sheriff Rutherford/City of Jacksonville under the Fourth Amendment.[5] Count IV is a conspiracy claim against Officer Tolen

---

  [4] Plaintiff is an African-American; everyone else in his party on the evening of the incident, including Tucker, was Caucasian. (Dep. of L. Perkins at 99)

  [5] Plaintiff alleges generally that various "practices, customs and policies" of the JSO caused his constitutional rights to be violated in the form of either False Arrest or Excessive Force. (Doc. 26 at ¶56)

and Jax Lanes under the Fourth Amendment. Counts V and VI assert state law claims against Sheriff Rutherford for False Imprisonment and Battery, respectively. Counts VII, VIII and IX are state law claims against Jax Lanes for False Imprisonment, Battery and Negligence, respectively.[6] The memorandum that follows addresses only the federal and state law claims against Sheriff Rutherford/the City (Counts III, V and VI).

## Summary Judgment Standard

A court should grant summary judgment when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(citations omitted). A dispute about a material fact is genuine, and summary judgment will not lie, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Thus, the party moving for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements

---

[6] Count IX was dismissed with prejudice on Jax Lanes's motion. (Doc. 31)

of its case on which it will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also, Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). To carry its burden, the non-movant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257; *United States v. Gilbert*, 920 F.2d 878, 882 (11th Cir. 1991). Plaintiff's evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 249. Thus, "[w]hen a moving party has discharged its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 1356 (1986)(internal citations omitted). Further, "[i]f the non-movant's response to the summary judgment motion consists of nothing more than mere conclusory allegations, the Court must enter summary judgment in the moving party's favor." *Ruszala v. Walt Disney World Company*, 95 F.Supp.2d 1323, 1325 (M.D.Fla. 2000)(citations omitted).

A.  **Count III (Section 1983 claim)**

### Municipal Liability under Section 1983

To prevail against a municipality in a civil rights action under 42 U.S.C. § 1983, a plaintiff must first show that the plaintiff was deprived of a right secured by the Constitution and laws of the United States.[7] Once a constitutional violation is demonstrated, a plaintiff must then prove that an

---

[7] *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S. Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662 (1986); *Everett v. Napper*, 833 F.2d 1507, 1510; *Dollar v. Haralson County*, 704 F.2d 1540, 1542-43 (11th Cir.), *cert. denied*, 464 U.S. 963, 104 S. Ct. 399 (1983). Section 1983 alone creates no substantive

official "custom" or "policy" was the "moving force" behind the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-94, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978); *see also, Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Municipal liability should not be imposed when the municipality was not itself at fault. *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L.Ed.2d 791 (1985). "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under §1983." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989) (citations omitted); *McMillan v. Monroe County, Ala.*, 520 U.S. 781, 785, 117 S. Ct. 1734, 1736 (1997). Thus, a municipality is not liable under Section 1983 solely for the acts of its employees. *Monell*, 436 U.S. at 690-695; *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986) (" ... the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property.")(emphasis original); *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (local government liability under Section 1983 cannot be based solely on the theory of *respondeat superior*); *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991) (civil rights liability may be imposed on a governmental entity only when the constitutional violation is due to the existence of an improper policy or the absence of a policy).

As will be discussed more fully below, the Sheriff is entitled to summary judgment on the federal claim asserted in Count III because the facts in the record do not support *Monell* liability

---

rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws. *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S. Ct. 2689, 2674 n. 3 (1979); *Wideman v. Shallowford Community Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir.1987). An underlying constitutional right must exist before a §1983 action will lie. *Wideman*, 826 F.2d at 1032.

regardless of any unconstitutional act by Defendant Tolen.

### There is no *Monell* evidence to support Plaintiff's federal civil rights claim

Plaintiff's claim of excessive force notwithstanding, there is no record evidence of a JSO custom, policy or practice of encouraging or tolerating the use of such force under similar facts and circumstances. *See* Declaration of D. Klinger (filed hereafter). Likewise, there is no record evidence that, at the time of this incident (January 2008), the Jacksonville Sheriff's Office was aware of a particular need to train regarding the circumstances of this encounter, and no evidence of related deliberate indifference to the need to train regarding same. Moreover, there is no evidence that any Jacksonville Sheriff's Office policy was the moving force behind Officer Tolen's alleged use of excessive force toward the Plaintiff. (*Id.*) Further, JSO's policies and procedures fully conform to national police standards and practices and the JSO is fully-accredited by CALEA–the Commission on Accreditation for Law Enforcement Agencies. *See* Declaration of JSO Undersheriff Senterfitt (filed hereafter). Finally, the Plaintiff has disclosed no expert to testify, nor is there any testimony at all in this record, that the JSO maintained or endorsed any custom or policy, written or unwritten, of condoning or tolerating the use of excessive force or the making of false arrests by JSO officers prior to or at the time of the incident.

The JSO trains its officers not to make arrests without probable cause. *See* Declaration of JSO Undersheriff Senterfitt. Likewise, the JSO does not maintain or endorse a policy or custom of failing to prevent or properly respond to the use of excessive force. (*Id.*) To the contrary, the JSO has in place an internal affairs division and an integrity unit which aggressively seek to detect and deter any such activity. (*Id.*) Operational orders in effect at the time of this incident specifically provided that arrests should not be made without probable cause and that only necessary force may be used, and

JSO policy did not condone or tolerate unnecessary or excessive force, or false arrests. (*Id.*) Moreover, as set forth in Undersheriff Senterfitt's declaration, when officers violate JSO's rules and procedures, including those pertaining to the use of force, they are subject to discipline.

Although Sheriff Rutherford and Defendant Tolen dispute Plaintiff's account of his arrest and seizure, the City is nonetheless not liable for any violation of Plaintiff's civil rights in the absence of a custom, policy or practice that endorsed or condoned what the Plaintiff claims to have happened/been done to him by Tolen <u>and</u> evidence that any such custom, policy or practice was the cause of Tolen's allegedly unconstitutional actions. There is simply no evidence of either in the record of which this writer is aware. *See, e.g., Burnette v. Ciolino,* 750 F. Supp. 1562, 1564-1565 (M.D.Fla. 1990)(citing to 5 shootings in a 5-year period in Lee County as "...nothing more than isolated incidents that clearly cannot be said to establish...a 'custom' or 'widespread practice...' as a matter of law); *Fitch v. Scott,* 2005 WL 1925028 *9 (M.D.Fla.)(even sheriff's personal participation in investigation of force incident insufficient to show ratification in absence of proof of widespread abuse; showing the sheriff knew about the incident afterwards "does not mean that the deputy acted pursuant to a...custom"). Plaintiff's argument here is essentially that this Court should turn the *Monell* doctrine on its head and impose *respondeat superior* liability in a Section 1983 action. As noted in the above cases and the cases cited therein; this is not, and should not be, the law.

As mentioned above, the Declaration of Undersheriff Senterfitt reflects the undisputed fact that the JSO was a fully accredited law enforcement agency by CALEA at the time of the incident. This important fact has been recognized previously in the Middle District, Jacksonville Division. *See Arline v. City of Jacksonville*, 359 F.Supp. 2d 1300, 1307 (M.D.Fla. 2005), noting that even the plaintiff's expert in that case conceded this to be true:

9

> With respect to police practices and evidence of the City's customs, practices and policies, the plaintiff retained Michael Cosgrove. Cosgrove's deposition transcript reveals that there is no deficiency in the City's official policies or rules. Cosgrove testified that JSO is accredited by CALEA and the State of Florida and complies with all 925 of the CALEA standards as well as 21 additional state standards. In Cosgrove's opinion, JSO is organized in such a way as to provide supervision and command level oversight consistent with customary and approved police practices.

Further, Undersheriff Senterfitt's uncontradicted declaration establishes that the JSO trains its officers not to use excessive force and not to make false arrests; thus, there is no evidence of any unwritten policy, custom or practice that encourages, condones or tolerates such behavior and no basis for any such assertion in support of Plaintiff's federal claim against the City. *See* Senterfitt declaration, which states, *inter alia*:

> 10. From February 2008 to April 2011, I served as Chair of the JSO Response to Resistance ("RTR") Review Board. The RTR Review Board reviews all instances of officer-involved shootings as well as other use of force incidents that result in serious injury or those in which a suspect's injury appears disproportionate to the level of force reported or indicated by the circumstances of the arrest or encounter. To my knowledge, there was not an arrest/use of force incident involving substantially similar facts to those described by Larue Perkins in this action in the five years prior thereto. The closest, arguably similar incident involved the arrest of Melanie Williams on May 8, 2005, following a vehicle pursuit and foot chase. The actions of the two officers involved ... were investigated by JSO Internal Affairs and both officers were disciplined for improper action and one was disciplined for using unnecessary force in the course of Ms. Williams's arrest.

Indeed, the only suggestion in the record of a "pattern or practice" of sanctioned police misconduct to satisfy the requirements of *Monell* appears in the form of Plaintiff's bare allegations regarding three earlier incidents between 2004 and 2006 in which suspects were injured by JSO officers in the course of their arrests (Doc. 26, ¶¶ 38-43), and Plaintiff's unsupported conclusions (as stated in Plaintiff's answers to Defendant Rutherford's First Interrogatories, #2) that one of the

alleged incidents (Barnes, in January 2006[8]) and another incident (Runge, in October 2007[9]) involved the use of excessive force by JSO officers. But none of the referenced incidents are substantially similar to Plaintiff's arrest. And, the minimal summaries of the incidents as contained in Plaintiff's allegations and interrogatory answers do not establish, in the first instance, that they necessarily involved the application of excessive force.[10] It should go without saying that there can be no pattern or practice of excessive force condoned or disregarded by the City if there are no proven instances of excessive force to begin with and, thus, no genuine issue of material fact as to pattern, practice and indifference, much less causation, can be shown and none is shown here. *See Btesh v. City of Maitland, Florida*, 2011 WL 3269647 *30 (M.D.Fla.)(expert's testimony that 48 justified uses of deadly force was "highly improbable," without identifying a single incident where he believed that the use of deadly force was unreasonable, does not create a genuine issue of material fact regarding whether city was on notice of a history of prior uses of excessive force); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)(noting that despite ten citizen complaints about a police officer, the city did not have any notice of past police misconduct because the plaintiff never demonstrated that the past complaints had any merit and because the number of complaints bears no relation to their validity); *Rada v. Miami-Dade Cnty.*, 2006 WL 4033817 (S.D.Fla. Dec. 7, 2006)(finding that seven

---

[8] *See* Arrest and Booking Report, Incident #2006-34078 (filed hereafter); Doc. 26 at ¶39.

[9] *See* Arrest and Booking Report, Incident #2007-898665 (filed hereafter).

[10] It should be noted that the officer responsible for allowing the suspect's head (Runge, October 2007) to hit the door of the jail as he was being carried inside the jail received a Written Reprimand and 20-day Suspension for "unacceptable conduct" after the incident was investigated by JSO Internal Affairs. (*See* letter of discipline attached to Senterfitt declaration at Exhibit 8.) In fact, the officer (Snow) was found to have used excessive force subsequently in the encounter but that is not the component of the incident that the Plaintiff contends in his interrogatory answers supports his pattern and practice claim in this matter.

11

shootings of mentally ill persons between 2002 and 2005, all of which were lawful, did not place the county on notice of prior violations of constitutional rights).

The facts are that in all the thousands of encounters between JSO and the public in 2007, the year before the incident involved herein, there were only 584 Response to Resistance incidents, a decrease of 23% from the previous year. (*See* JSO Police Response to Resistance Annual Report – 2007.)[11] Not only do the 584 incidents represent only 1.1% of the total physical arrests by JSO for that year, Plaintiff's Amended Complaint fails to allege the use of excessive force in even one instance in 2007 (only the Runge incident mentioned in Plaintiff's interrogatory answers occurred in 2007), much less the failure of the JSO to investigate and discipline as warranted. In fact, in January 2007, a JSO officer was found by the department to have committed minor unnecessary force and was suspended for 3 working days without pay. (*Id.*) Then, in June 2007, an allegation of excessive force was made against another JSO officer. The allegation was investigated, sustained and the officer was fired in November 2007. (*Id.*) And, as stated earlier, the officer involved in the October 2007 Runge incident received a written reprimand and a 20-day suspension (a major discipline) in June 2008 for excessive force and unacceptable conduct. (*Id.*) That the officers mentioned above were disciplined both before and after the Plaintiff's incident, and before this lawsuit was commenced, is significant evidence that the JSO did not maintain or condone an improper policy or custom regarding the use of excessive force by JSO officers at the time of Plaintiff's encounter with Officer Tolen. *See, e.g., Skop v. City of Atlanta,* 485 F.3d 1130 (11th Cir. 2007), affirming a summary judgment on a *Monell* claim:

---

[11] *See* Declaration of Undersheriff Senterfitt, Exhibit 7.

> The City of Atlanta undeniably trains its officers not to arrest unless there is probable cause. Indeed, the fact that the Officer Brown was officially disciplined for his actions by the Atlanta Police Department well in advance of the present lawsuit suggests that his actions were inconsistent with APD goals and training. Because Skop has not introduced any evidence that a custom or policy of the City of Atlanta was a "moving force" of her unconstitutional arrest, we affirm the district court's award of final summary judgment to the city.

*Id.* at 1145. In short, the before and after facts fully support Undersheriff Senterfitt's declaration and completely refute Plaintiff's complaint of a pattern of excessive force or false arrests and the condoning of same by the JSO prior to and as of January 2008.

**B.     Counts V and VI (False Imprisonment/Arrest and Battery)**

**Plaintiff's state law claims are barred by operation of law**

By his own testimony, the Plaintiff's account of the incident is that Officer Tolen intentionally and without legal justification grabbed him, picked him up and slammed his face into the concrete parking lot of the bowling alley. (*See* Dep. of L. Perkins at 103-107.) By any definition or characterization, Plaintiff describes a bad faith, wanton and willful and/or malicious act in the course of his arrest and seizure for which the City is not liable under Section 768.28(9)(a), Fla. Stat.[12] Here is the Plaintiff's account, in his own words, of his encounter with Officer Tolen, which is the factual basis on which the legal sufficiency of his claims, federal and state, must be determined:[13]

---

[12] In relevant part, Section 768.28(9)(a), Florida Statutes, provides as follows:

> The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent ... committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

[13] *See Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005)(nonmovant's version of events must be credited by the court as a unified whole and nonmovant may not withstand summary judgment via defense evidence that contradicts his own sworn testimony); *accord, Sullivan v. Satsuma*, 2005 WL 2895983 (S.D.Ala.).

13

**103**[14]

```
 1    A   Facing Beach Boulevard, yes, sir.
 2    Q   So do you-all start walking from the front
 3        door after you pass this tall, large officer?
 4    A   Yes.
 5    Q   You start walking across the parking lot?
 6    A   Straight across to the taxi, yes.
 7    Q   Is that uneventful?  Anything happen there?
 8    A   Well, as we start walking, Officer Tolen
 9        comes from behind us and makes a comment and says,
10        "That's them young punks I had a problem with earlier."
11    Q   This is as you're walking to the taxi?
12    A   To the taxi, yes.
13    Q   He's walking behind you?
14    A   Behind me.  He comes from behind me.  I don't
15        know where -- if he came from the side of the building
16        or I don't know where he came from.  Because we're
17        walking to the taxi.  But I hear his voice behind us
18        say, "Yeah, that's the young punks I had a problem with
19        earlier."
20    Q   Is he talking to somebody?
21    A   He's talking to the tall cop, the one that
22        grabbed Joe's arm.
23    Q   So Officer Tolen is standing up somewhere
24        near the front door when he makes that comment?
25    A   When he makes the comment, correct.  Correct.
```

**104**

```
 1    Q   And how far are you from the sidewalk at this
 2        point?
 3    A   Not very far, probably in that first set of
 4        parked cars right there.
 5    Q   Somewhere between the sidewalk and the first
 6        set of parked cars?
 7    A   Correct, yeah.
 8    Q   So what happens?  Do you respond?
```

---

[14] Dep. of L. Perkins, pages 103-108, line 8 (questions by Attorney Joseph B. Stokes, counsel for Defendant Jax Lanes)(emphasis added: select <u>questions</u> underlined; **answers** in bold).

```
9    A   Yes. I turn around and say, "Are you
10       referring to the shoe incident? I said we were sorry
11       about that. I'm sorry. We're sorry for being outside
12       with our shoes."
13           We turned around to continue walking -- or at
14       least I did. They still were walking in front of me,
15       and then I turned around and started walking. He said,
16       "You need to take your ass home now."
17           And I turned around and I said, "We're going
18       home. We had nothing to do with what's going on in
19       this building. We're leaving and we're going home."
20   Q   You said it to him like you're saying it to
21       me today?
22   A   Correct.
23   Q   Not with your voice raised or --
24   A   No, no, no, not at all.
25   Q   Just like you're talking to me today?
```

105

```
1    A   Just like I'm talking to you, correct.
2            And at this point, that's when everybody was
3        piling into the taxi, when I said that. And then when
4        I turned around, I hear him say, "That's it."
5        And then I went to get into the taxi. He
6        came behind me, bear-hugged me and slammed me
7        face-first on the concrete.
8    Q   It sounds like the second comment you made to
9        him about, you know, we're going home, is he following
10       you out there?
11   A   He's following me all the way to the taxi.
12   Q   Just Officer Tolen?
13   A   Just -- Officer Tolen is the only one I see.
14       I see another officer posted up by the taxi, on the
15       right-hand side of the taxi, up front. I saw one
16       standing there. One was at the door. You know, I saw
17       another one out in the parking lot. You know, they
18       were just strategically placed throughout the parking
19       lot.
20   Q   But they weren't involved in your
21       conversation with Officer Tolen?
22   A   Not at all.
23   Q   So the group gets into the taxi.
```

```
24    A   Uh-huh.
25    Q   And you're attempting to get in?
```

**106**

```
 1    A   I'm the last one to get in.
 2    Q   And do you actually step in when he grabs
 3        you?
 4    A   No.  I lift my leg up to step in.
 5    Q   Do you remember which leg?
 6    A   My right leg.  I remember like it was
 7        yesterday.  I lifted my right leg to step, to get into
 8        the taxi.  He came behind me and bear-hugged me and
 9        pinned my arms to my side and carried me all the way
10        over.  And his whole weight and everything, we hit the
11        ground.
12    Q   And you're attempting to get into the taxi
13        through the sliding door?
14    A   Through the sliding door.
15    Q   And you've told me about all the
16        conversations that took place in the parking lot
17        between you and Officer Tolen?
18    A   That's the only words we exchanged.
19    Q   Did anyone else in your group ever make any
20        comments either directly or indirectly to Officer Tolen
21        as you-all were walking to the taxi?
22    A   No.
23    Q   No one else said nothing?
24    A   No.
25    Q   You were the only one that said anything?
```

**107**

```
 1    A   I was the only one that said something.
 2    Q   And it sounds like when you went to step into
 3        the taxi with your right foot is when you claim that
 4        Officer Tolen came from behind you and bear-hugged you?
 5    A   Bear-hugged me.
 6    Q   And does he throw you to the ground or --
 7    A   He bear-hugs me and carries me all the way
 8        over and we both hit the ground.  He falls on top of my
 9        back.  He's landing on top of me and we hit the ground.
10    Q   So once he bear-hugs you, does he turn right
```

```
11      or left?
12   A  When he bear-hugs me, I believe he goes to
13      the left and brings me all the way over, like that
14      (demonstrating).
15   Q  Left and brings you -- excuse me -- left in
16      this direction --
17   A  Toward -- yeah. When I hit the ground, I was
18      looking at the front door of the bowling alley.
19   Q  So you're looking back towards the bowling
20      alley?
21   A  Correct.
22   Q  So he basically bear-hugs you and kind of
23      does a 180 back towards the bowling alley?
24   A  Correct, correct.
25   Q  Does he move in any direction, or does he

108

1       stay put with a pivot 180 degrees? In other words,
2       does he grab you and turn you this way (demonstrating),
3       or does he grab you and start walking towards the front
4       of the bowling alley?
5    A  No. He grabs me, picks me up off of the
6       ground and turns me and slams me into the ground. So
7       he grabs me, picks me up off the ground and then turns
8       and slams me face-first into the ground.[15]
```

Thus, by his own, sworn account, the Plaintiff was fully compliant with Officer Tolen's commands throughout the encounter; in particular, according to the Plaintiff, he was actually attempting to get into the taxi with his back to Tolen when Tolen acted against him and the Plaintiff did nothing whatsoever to justify his arrest or seizure. Therefore, Plaintiff's account can only be viewed as stating that Officer Tolen acted against the Plaintiff purely out of spite and/or anger toward the Plaintiff and his party, i.e., in bad faith or in a wanton and willful and/or malicious manner.

---

[15] In his answers to Defendant Jax Lanes's interrogatories, Plaintiff similarly described the incident: "As I attempted to enter a taxi cab to leave Jax Lanes, I was grabbed from behind by Officer Tolen and slammed face first into the ground." (Plaintiff's Answers to Defendant Jax Lanes, Inc.'s First Interrogatories, #8.)

Accordingly, Plaintiff's state law tort claims against the City (Counts V and VI) are barred by operation of law.[16]

## CONCLUSION

There is no evidence in the record that an unconstitutional or improper custom, policy or practice, formal or informal, was maintained or endorsed by the JSO, at the time of Plaintiff's arrest and seizure, that tolerated false arrests or the use of excessive force by its officers against members of the Jacksonville public. Rather, the uncontradicted evidence is that the JSO had, and continues to have, a policy that prohibits such behavior and a practice and history of disciplining its officers when found to have violated law or policy. Nor is there any evidence that any bad practice or policy of JSO was the direct or proximate cause of any harm to the Plaintiff. Sheriff Rutherford is, therefore, entitled to summary judgment on Count III. In addition, according to the Plaintiff's own, sworn version of the incident, his injuries were the result of the bad faith, wanton and willful and/or malicious acts of Officer Tolen; thus, the City is immune to Plaintiff's state law claims pursuant to Florida law and is, therefore, entitled to summary judgment on Counts V and VI as well.

---

[16] As to Count V (False Imprisonment/Arrest), *see Franco v. Caldwell*, 2011 WL 2262481 *6 (S.D.Fla.), citing *Willingham v. City of Orlando*, 929 So. 2d 43 (Fla. 5th DCA 2006)(police officer <u>immune from suit and not liable</u> for false arrest damages <u>unless</u> officer acted in bad faith or in a wanton and willful and/or malicious manner).

Respectfully submitted,

OFFICE OF GENERAL COUNSEL

s/ Stephen J. Powell
**STEPHEN J. POWELL**
**ASSISTANT GENERAL COUNSEL**
Florida Bar No.: 305881
spowell@coj.net
117 West Duval Street, Suite 480
Jacksonville, Florida  32202
904-630-1847; 904-630-1316 (fax)
Attorneys for Defendant Sheriff Rutherford

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of January, 2012, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

OFFICE OF GENERAL COUNSEL

s/ Stephen J. Powell
**STEPHEN J. POWELL**
**ASSISTANT GENERAL COUNSEL**
Florida Bar No.: 305881